AO 91 (Rev. 11/11) Criminal Complaint                                AUSA Hayley Altabef (312) 353-5357

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| UNITED STATES OF AMERICA | |
|---|---|
| v. | CASE NUMBER: 25 CR 47 |
| Elaine PEREZ PENA | |

**FILED** 1/26/2025
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about January 25, 2025, at O'Hare International Airport, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 841(a)(1) | did knowingly and intentionally possess with intent to distribute a controlled substance, namely, 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Narcotic Drug Controlled Substance. |

This criminal complaint is based upon these facts:
  X   Continued on the attached sheet.

PATRYK K. LUKASZEWSKI
Special Agent, Homeland Security Investigations (HSI)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: January 26, 2025

*Judge's signature*

City and state: Chicago, Illinois

Gabriel A. Fuentes, Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## AFFIDAVIT

I, PATRYK K. LUKASZEWSKI, being duly sworn, state as follows:

1. I am a Special Agent with the Homeland Security Investigations ("HSI"). I have been so employed since approximately August 2019. Prior to my employment with HSI, I was employed as a Federal Air Marshal with the HSI and as a Special Agent with the Department of Defense.

2. As part of my duties as an HSI Special Agent, I investigate criminal violations relating to narcotics trafficking offenses, including criminal violations of the Federal Controlled Substance laws, including, but not limited to Title 21, United States Code, Sections 952, 841 and 846. I have been involved with various electronic surveillance methods, the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage and importation of controlled substances.

3. This affidavit is submitted in support of a criminal complaint alleging that ELAINE PEREZ PENA, has violated Title 21, United States Code, Section 841(a)(1). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging PEREZ PENA with possession of a controlled substance with the intent to distribute, I have not included each and every fact known to me concerning this investigation. I have

set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

I. FACTS SUPPORTING PROBABLE CAUSE

A. PEREZ PENA's Criminal History

4. On or about May 23, 2022, in the United States District Court for the Eastern District of New York, PEREZ PENA pled guilty to importing cocaine, in violation of Title 21, United States Code, Sections 952(a), 960(a)(1), and 960(b)(2)(B), and to possessing with intent to distribute 500 grams or more of cocaine, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B)(ii). *See* Case No. 21 CR 501, at Dkt. 21. For these offenses, she received a sentence of time served (after spending approximately nine months in custody) and two years on supervised release. *Id.*

5. According to the complaint associated with 21 CR 501, on or about September 21, 2021, PEREZ PENA landed in John F. Kennedy International Airport in Queens, New York, from Punta Cana, Dominican Republic. *See* Case No. 21 CR 501, at Dkt. 1. Customs officers found within her suitcase approximately 2.89 kilograms of a white, powdery substance that tested positive for cocaine. *Id.*

B. O'Hare Airport Encounter

6. On January 25, 2025, PEREZ PENA arrived at O'Hare International Airport as a passenger onboard United Airlines ("UA") Flight # 844 from Sao Paulo, Brazil, with a connecting flight to Newark, New Jersey, on UA Flight # 563. After exiting the plane, PEREZ PENA, seated in a motorized wheelchair, entered the primary inspection area with one small purse and a cane.

2

7. Based on PEREZ PENA's previous conviction, as detailed in paragraphs 4 and 5, supra—in which PEREZ PENA tried to smuggle more than two kilograms of cocaine through JFK Airport in a suitcase—customs officers referred PEREZ PENA to a secondary inspection area. PEREZ PENA, still seated in the motorized wheelchair, arrived in the secondary inspection area with her purse, her cane, and a small roller bag that she had checked on the plane.

8. During her secondary inspection, PEREZ PENA told customs officers words to the effect that she knew why she was being searched, and that she had been caught with drugs in her suitcase in the past. PEREZ PENA also said words to the effect that last time customs officers inspected her and her belongings, she was subject to a canine search and then released.

9. During her secondary inspection, PEREZ PENA told customs inspectors that she was tired and her leg hurt. While customs officers were examining her belongings, PEREZ PENA said she needed to use the restroom and that she had a hard time walking. Customs officers escorted her to the restroom and then continued with the examination.

10. Customs officers inspected the suitcase and found nothing inside of PEREZ PENA's checked roller bag. Customs officers then began to examine the motorized wheelchair. Customs officers observed that the cushions on the motorized wheelchair seemed newer compared to the rest of the wheelchair, as if recently replaced. They then sent the wheelchair through the X-ray machine, where they noticed in the wheelchair cushions anomalies in density and colors inconsistent with

X-ray images of normal cushioning. Upon noticing the anomalies on the X-ray images, a Customs K9 Officer searched the wheelchair with his narcotics canine. The narcotics canine gave a positive response to the odor of narcotics on the wheelchair.

11. Based on the X-ray results and the response of the narcotics canine, the Customs K9 officer conducted an intrusive exam on the wheelchair by drilling into one of the wheelchair cushions. Upon removing the drill, the officer observed a white powdery substance on the tip of the drill. Customs officers tested the white powdery substance with a Gemini device and a field test kit, both of which indicated the substance was positive for properties of cocaine. A customs officer took apart the cushions on the motorized wheelchair and found approximately 14 packages containing a white powdery substance that tested positive for cocaine and weighed a total of approximately 14.08 kilograms.

12. Law enforcement then placed PEREZ PENA in a holding area. When a customs officer conducted a check on PEREZ PENA in the holding area, PEREZ PENA told the officer words to the effect that she knew what was in the wheelchair and would like to talk.

13. I, along with an HSI task force officer, escorted PEREZ PENA into an interview room equipped with audio and video recording devices. Before moving PEREZ PENA to the interview room, I offered to provide her a new wheelchair; she said no. I also offered to get her cane. She said no and said that she could walk.

14. In the interview room, I advised PEREZ PENA of her Miranda rights, and PEREZ PENA signed the Miranda waiver. When I asked PEREZ PENA if she

4

was willing to speak to with me about the events that transpired today. PEREZ PENA responded, "what do I want to talk to you about I'm already fucked up". I then terminated the interview.

15. Later that day, law enforcement moved PEREZ PENA to a holding cell equipped with a video-only recording device.[1] While she was alone in the holding cell, I observed via video feed PEREZ PENA pacing back and forth without difficulty and without assistance. Later that evening, when I obtained from PEREZ PENA her biographical information, I asked if she had any medical conditions. She said no. When I asked her if she wanted her cane while we transported her to the corrections facility, she again said no.

16. Based on my training and experience and the training and experience of my colleagues, I know that the current approximate street value for one kilogram of cocaine is between $17,000 and $20,000. Also based on my training and experience and the training and experience of my colleagues, most drug couriers—especially those entrusted with multi-kilogram quantities of narcotics—have knowledge that they are carrying a controlled substance.

---

[1] The holding cell did not have an audio recording device, and there was no audio feed accompanying the video footage.

## II. CONCLUSION

17. Based on the foregoing facts, I respectfully submit that there is probable cause to believe that, on or about January 25, 2025, ELAINE PEREZ PENA, did knowingly and intentionally possess with intent to distribute a controlled substance, namely, 5 kilograms or more of a mixture and substance containing a detectable amount of Cocaine, a Schedule II Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, Section 841.

FURTHER AFFIANT SAYETH NOT.

_____
PATRYK K. LUKASZEWSKI
Special Agent, Homeland Security
Investigations

SWORN TO AND AFFIRMED on January 26, 2025.

_____
Honorable Gabriel A. Fuentes
United States Magistrate Judge

6